Merrimack
No. 86-214

RIBLET TRAMWAY COMPANY, INC.

v.

WALLACE E. STICKNEY, INDIVIDUALLY
AND AS COMMISSIONER OF THE NEW HAMPSHIRE
DEPARTMENT OF TRANSPORTATION, & a.

March 5, 1987

*McSwiney, Jones, Semple, & Douglas,* of Concord (*Charles G. Douglas, III,* on the brief and orally), for the plaintiff.

*Stephen E. Merrill,* attorney general (*Bruce E. Mohl,* deputy attorney general, and *Michael J. Walls,* assistant attorney general, on the brief, and *Mr. Mohl* orally), for the State.

BATCHELDER, J. Two questions are raised by this interlocutory transfer from the Superior Court (*Cann,* J.): (1) Does due process under the National Constitution or the New Hampshire Constitution require that the State conduct a hearing prior to the termination of the contract between Riblet Tramway Company, Inc. (Riblet) and the State? (2) Is the State required to submit the unfinished portion of Riblet's contract to competitive bidding? We answer the first question in the negative and find the second question moot.

The transferred questions are grounded on a rather short business relationship between the State of New Hampshire in seeking to improve its downhill skiing facilities at Mt. Sunapee and Riblet in providing the engineering, work, and materials which the project required. The facts certified to this court as contained in the interlocutory transfer are briefly stated as follows. On or about June 20, 1985, John P. Chandler, Commissioner of the Department of Public Works and Highways, on behalf of the State of New Hampshire, advertised for bids for the design, manufacture and erection of three triple chairlifts, the dismantling of the three existing chairlifts and the replacement of certain equipment in the State's ski area at Mt. Sunapee State Park. Riblet was the low bidder. On September 18, 1985, the Governor and Council held a public hearing and, by a vote of four to one, accepted Riblet's bid. The approval of the Riblet bid

was contingent upon Riblet's securing indemnification for the State, which was secured; and final approval was given on September 25, 1985. On or about December 31, 1985, Riblet's excess liability and products liability insurance expired, and on January 15, 1986, Commissioner of the Department of Transportation Wallace E. Stickney sent a default of contract notice to Riblet on that ground. The default notice gave Riblet until 4:00 p.m. the following day to provide certificates of insurance, after which time the department would suspend all work on the project until the required insurance certificates were on file.

On January 21, 1986, after confirming that an irrevocable letter of credit in the amount of $1.5 million would be issued in favor of the State of New Hampshire in lieu of insurance, Director of Public Works and Administration Robert Dowst informed Riblet that construction could be resumed. On March 5, 1986, Riblet was sent a default of contract notice for failure to properly complete and have certified lift A. On March 18, 1986, Commissioner Stickney terminated the contract with Riblet pursuant to Section 54 thereof.

On April 23, 1986, the Commissioner of the Department of Transportation and Deputy Attorney General Mohl presented to the Governor and Council a request that the department of transportation be authorized to enter into a contract with Doppelmayr Ski Lift Co., Ltd. (Dopplemayr) to design, fabricate and erect a new Summit triple chairlift and a new North Peak triple chairlift at Mt. Sunapee State Park for a contract price of $1,533,000. The Summit and North Peak lifts constitute lifts B and C in the contract.

Authority to enter into a contract with Doppelmayr was approved by a three to two vote of the Council. The proposed contract with Doppelmayr was not subject to the competitive bidding process set forth in RSA 228:4 (Supp. 1986) and RSA 228:4-a (Supp. 1986), and the parties disagree over whether it should have been.

The plaintiff sued the State, seeking, *inter alia*, to enjoin the State from substituting another contractor for the plaintiff on the Mt. Sunapee project, a judicial determination that the State's termination of the contract was void for failure to provide due process, attorney's fees and costs under 42 U.S.C. § 1988, and an injunction against the State from awarding any contract for the completion of the work by a bidding process not in accordance with the provisions of RSA 228:4 (Supp. 1986) and :4(a) (Supp. 1986). The pleadings were styled as a bill in equity seeking a declaratory judgment under RSA 491:22 and injunctive relief under RSA 498:1 and as a petition for writ of certiorari, and the Master (*Mayland H. Morse, Jr.*, Esq.) considered this case at a hearing on May 1, 1986.

After the hearing on the preliminary injunction before the master, the court on May 22, 1986, transferred the following questions to this court:

"A. DOES RIBLET HAVE PROPERTY AND LIBERTY INTERESTS IN THE CONTRACT WITH THE STATE UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND PART I, ARTICLES 12 AND 15 OF THE NEW HAMPSHIRE CONSTITUTION, WHICH REQUIRES (sic) A HEARING PRIOR TO TERMINATION OF THE CONTRACT[?]

B. IS THE STATE REQUIRED TO SUBMIT TO COMPETITIVE BIDDING THE CONTRACT FOR THE COMPLETION OF ALL OR A PORTION OF THE TERMINATED CONTRACT WITH RIBLET?"

The State's attempt to expedite the completion of the Mt. Sunapee project by contracting with Dopplemayr has been delayed by the litigation, and the department of transportation has decided to rebid the work remaining under Riblet's contract on a competitive basis after the conclusion of this case. Therefore, we do not consider the second transferred question because it is moot.

The plaintiff claims entitlement to be heard prior to termination of its contract with the State and bases its claim on a right to due process of law under both the State and Federal Constitutions. The State responds to this claimed right by asserting that, in the absence of a constitutional property right intended to be created in the contract, there is none and that a lawsuit for breach of contract is the plaintiff's appropriate remedy.

■ We begin our analysis by considering the plaintiff's due process claim under the New Hampshire Constitution, relying on federal precedents only for guidance. *See State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 351 (1983). Part I, article 15 of the New Hampshire Constitution guarantees that no one "shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land. . . ." We have consistently interpreted "'the law of the land' as synonymous with 'due process of law.'" *Petition of Bagley*, 128 N.H. 275, 282, 513 A.2d 331, 337 (1986) (citing *Mayo v. Wilson*, 1 N.H. 53, 54–55 (1817)).

■■ The due process guarantee of the Federal Constitution protects, where applicable, both natural persons and corporate enti-

ties such as Riblet, *see, e.g., Minneapolis & St. Louis Railway v. Beckwith*, 129 U.S. 26, 28 (1889); and we will assume for the purposes of this case that the same is true under article 15. In determining whether a particular State action violates the procedural due process requirement of the State Constitution, we undertake a two-part analysis. *Appeal of Catholic Medical Center*, 128 N.H. 410, 416, 515 A.2d 1205, 1208 (1986). First, we determine whether the challenged State action concerned a constitutionally protected interest. If so, we proceed to determine whether the action was accompanied by the "appropriate procedural safeguards." *Id.*; *Petition of Bagley supra.*

Our initial inquiry is whether there is a protected liberty or property interest at stake. *Appeal of Plantier*, 126 N.H. 500, 506, 494 A.2d 270, 273 (1985). Riblet argues that the State's termination of the contract deprives it of property without due process in three distinct ways: (1) by placing a continuing financial obligation on it for years after termination of the contract; (2) by efffectively barring it from bidding on future contracts; and (3) by "taking" its rights in the contract without a prior hearing.

■ The first two arguments do not require extended analysis. The continuing financial obligation complained of stems from Riblet's contractual obligation to provide insurance for equipment installed under the contract for the "life" of that equipment. Riblet's insurance was terminated, and it provided an irrevocable letter of credit in lieu of insurance. Although it cites no authority for this assertion, Riblet claims that the State's refusal to waive performance of this costly requirement constitutes a taking of property. We cannot agree. Riblet voluntarily bound itself to this obligation when it entered the contract, and although agreeing to this aspect of the contract may seem unwise in retrospect, the State has not deprived Riblet of property by requiring it to perform its contractual obligation.

Riblet's second "property" argument is also without merit. A careful review of the record indicates that the State's termination of the contract did not bar Riblet from bidding on future State contracts. A subsequent State action denying Riblet's request for a renewal of its pre-qualification to bid does, however, prevent it from bidding on State contracts for the time being, but that is a separate issue on which it is entitled to a hearing. *See* N.H. ADMIN. CODE, Tra 200 *et seq.* In fact, such a hearing had already been scheduled prior to oral argument in this case, but that hearing was continued at Riblet's request. Furthermore, the pre-qualification committee's decision not to renew Riblet's pre-qualification had the same effect as a decision

not to grant pre-qualification. In this context, the denial of a privilege not yet given must be distinguished from the loss of a privilege already granted, *Stone v. Perrin*, 118 N.H. 109, 111, 382 A.2d 1112, 1113 (1978), because one cannot have a property interest in a privilege before it is granted. *See Board of Regents v. Roth*, 408 U.S. 564, 576–78 (1972) (no property interest in having contract renewed).

 Riblet's final "property" argument is more compelling. Previously, we have recognized:

> "Property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules—or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Duffley v. N.H. Interschol. Ath. Assoc., Inc.*, 122 N.H. 484, 491, 446 A.2d 462, 466 (1982) (quoting *Roth, supra* at 577). Thus, Riblet's claim that it has a property interest in the contract must be analyzed under State contract law.

 Generally, "[t]he construction of a written contract is a question of law for this court." *Mast Rd. Grain & Bldg. Mat's Co. v. Piet*, 126 N.H. 194, 196–97, 489 A.2d 143, 145 (1985) (quoting *Logic Assoc's Inc. v. Time Share Corp.*, 124 N.H. 565, 571, 474 A.2d 1006, 1010 (1984)). When interpreting contracts, the intent of the parties is determined based upon an objective reading of the agreement as a whole. *Kilroe v. Troast*, 117 N.H. 598, 601, 376 A.2d 131, 133 (1977). Contractual language is construed according to its common meaning, *Mast Rd. Grain & Bldg. Mat's Co. supra*, and this court will give a contract the same meaning as would a reasonable person, *Murphy v. Doll-Mar, Inc.*, 120 N.H. 610, 611–12, 419 A.2d 1106, 1108 (1980).

Section 54 of the contract, the provision in question, provides that the State may terminate the contract for several enumerated causes or "[f]or any other causes whatsoever, [if Riblet] fails to carry on the Work in an acceptable manner . . . ." Read in light of the principles stated above, it is clear to us that Section 54 gave the State discretion to terminate the contract, without breach, if for any cause either Riblet's performance or its manner of performance was unacceptable. This section did not, however, give the State unlimited discretion to terminate the contract without cause. The determination of whether or not performance was acceptable had to be made according to objective standards; *i.e.*, the requirements and specifications of the contract. If Riblet were to meet all contractual

requirements, its performance would be acceptable, and the State could not terminate the contract without breaching it. Thus the contract may only be terminated under Section 54 for cause.

▮ Riblet argues that it has a property interest in the contract because the State can terminate the contract only for cause, and the State does not seriously dispute this issue. In *Duffley supra,* we stated,

> "The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' Once that characteristic is found, the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'"

122 N.H. at 491, 446 A.2d at 466 (quoting *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982) (citations omitted)). Riblet's interest in the contract falls squarely within this rubric, and, indeed, contracts are among the more traditional forms of property. *See Lynch v. United States,* 292 U.S. 571, 577–79 (1934) (contracts are property protected by the fifth amendment of the United States Constitution). Therefore, we hold that Riblet has a property interest created by State law in its contract.

We turn now to Riblet's alleged liberty interest. Riblet contends that the State's action adversely affected "a protected liberty interest, the ability to obtain future employment," because the termination damaged its reputation, making it more difficult to find work. Riblet relies on *Appeal of Plantier,* 126 N.H. 500, 494 A.2d 270 (1985), in making this argument, but that reliance is misplaced. In *Plantier,* we stated that "the right to engage in one's occupation is a privilege of fundamental significance." *Id.* at 507, 494 A.2d at 273. In that case, however, we held that a physician had a property interest in his license, without which he would have been completely foreclosed from his chosen profession. *Id.* at 506, 494 A.2d at 273. That is not the case here. Although Riblet claims that it is more difficult to find work because its reputation is damaged, it does not contend that it is not free to seek other work. In fact, Riblet has found other work. Since the termination of the contract, Riblet has entered into several new contracts. Clearly, Riblet has not been denied the right to work in its chosen field.

▮ Furthermore, even assuming *arguendo* that the termination of the contract incidentally damaged Riblet's reputation and indirectly made it more difficult to find work, the "injury" would not be cognizable under the New Hampshire Constitution, part I,

article 15. In a free society, "the meaning of 'liberty' must be broad indeed," *Board of Regents v. Roth*, 408 U.S. at 572, "[b]ut the range of interests protected by procedural due process is not infinite." *Id.* at 570. Although our case law makes clear that government action which stigmatizes a person may impair a person's liberty, *see Petition of Bagley*, 128 N.H. at 284, 513 A.2d at 338 (parents labeled neglectful), we will not extend this rule to encompass the type of unintentional, incidental injury to reputation which may occur when the State terminates a commercial venture. Such incidental injury to reputation, without more, is not a deprivation of "liberty."

 The State argues that we need not go further with our analysis because, although we have held that Riblet has a property interest in the contract, that interest is not a *protected* property interest. This argument finds no support in our case law. Our initial inquiry concerns not the weight, but the nature of the interest at stake. *See Roth, supra* at 570–71; *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (discussing federal due process). Once it is determined that the interest at stake is of the type protected by part I, article 15 of the New Hampshire Constitution, *i.e.*, liberty or property, then due process protections apply.

Thus we must proceed to the second part of our constitutional analysis: what process is appropriate in this context? Riblet argues that it should have been afforded a hearing prior to the State's termination of the contract. We disagree, because we find that the traditional contract remedies fully afford Riblet due process.

 A primary consideration of due process is fundamental fairness. *See City of Claremont v. Truell*, 126 N.H. 30, 36, 489 A.2d 581, 586 (1985). Procedural due process requires "'an *opportunity* . . . granted at a meaningful time and in a meaningful manner' . . . 'for [a] hearing appropriate to the nature of the case.'" *Logan*, 455 U.S. at 437 (citations omitted) (emphasis in original). In this case, Riblet has the opportunity to bring an action for breach of contract in superior court because the State terminated its contract. RSA 491:8; *see Morgenroth & Associates, Inc. v. Town of Tilton*, 121 N.H. 511, 515–16, 431 A.2d 770, 772–73 (1981) (superior court has jurisdiction to hear claims against the State based on express and implied in fact contracts under RSA 491:8). To determine whether the nature and timing of the hearing in any such action comports with due process, we consider the following factors:

> "(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if

any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Petition of Bagley,* 128 N.H. at 285, 513 A.2d at 338–39 (citing *Appeal of Portsmouth Trust Co.,* 120 N.H. 753, 757, 423 A.2d 603, 605 (1980)).

██ ██ As the phrase "law of the land" indicates, procedural due process is a traditional, though flexible, concept. The traditional common law remedy for breach of contract is a subsequent action for damages. *See, e.g.,* RESTATEMENT OF CONTRACTS § 327 (1932); *Carroll v. Giddings,* 58 N.H. 333 (1878). Absent extraordinary circumstances, it is presumed that an award of money damages for breach of contract will put the injured party "in as good a position as he would have been in had the contract been performed." RESTATEMENT (SECOND) OF CONTRACTS § 347, comment *a* (1979). It is against this background that parties exercise their liberty to contract, and, outside the tenured employment context, it has traditionally been assumed that this remedy satisfies due process. In a similar context, the United States Supreme Court stated: "When the United States enters into contract relations, its rights and duties therein are governed by the law applicable to contracts between private individuals." *Lynch,* 292 U.S. at 579 (discussing rights recognized under the fifth amendment). The competing interests at stake in this case must be considered in light of this common law tradition. *See Ingraham v. Wright,* 430 U.S. 651, 675 (1977) (students' liberty interest in remaining free from corporal punishment considered in light of common law tradition).

The private interest at stake here is Riblet's property interest in the completion of a construction contract. Although this interest is not insubstantial, it is far less weighty than those involved when, for example, a welfare recipient is denied his benefits, *Goldberg v. Kelly,* 397 U.S. 254, 264 (1970) (very means by which to live at stake), or an individual's employment is terminated, *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543 (1985) (recognizing severity of depriving a person of his means of livelihood). The record indicates that Riblet has continued its other operations despite the State's termination of its contract. So, it is clear that, unlike the welfare recipient or the wage earner, Riblet has other resources to draw upon. Moreover, we find it significant that Riblet voluntarily embarked on a commercial venture, with all the attendant risks.

Thus, the possibility that the State would terminate the contract was not unforeseen.

In addition, there is no risk that Riblet will be permanently deprived of its property without a hearing. *See Signet Const. Corp. v. Borg,* 775 F.2d 486, 491 (2d Cir. 1985). As noted above, Riblet is entitled to a full trial in superior court. RSA 491:8. At trial, Riblet will, of course, have the opportunity to produce evidence and testimony, cross-examine opposing witnesses, and present its arguments to the presiding justice. The nature of this proceeding clearly satisfies due process.

Of course, the trial is not available until after the State terminates a contract. However, the contract itself required that the State provide Riblet and its surety with notice of defaults, and, in fact, an opportunity to cure the alleged default was provided. Thus, the risk of an erroneous deprivation was reduced by Riblet's opportunity to present its side of the story informally prior to the termination of the contract. *Cf. Signet Const. Corp. supra.* In addition, the risk that the State wrongfully terminated the contract must be weighed in light of the common law presumption that money damages are available to make Riblet whole. *See Parratt v. Taylor,* 451 U.S. 527, 542 (1981) (quoting *Bonner v. Coughlin,* 517 F.2d 1311, 1315 (7th Cir. 1975), *modified en banc,* 545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932 (1978)).

Furthermore, the State had important interests in expeditious action. The contract itself makes it clear that time was critical. Completion of the contract was vital to the operation of the State's recreational services. Without the equipment Riblet agreed to provide, the State was unable to operate the designed lifts during the 1986–87 ski season.

In general, to properly manage its resources, the State must have the ability to act expeditiously when inspection reveals what it believes to be defective performance by a State contractor. An evidentiary hearing prior to termination would cause delays, and unnecessarily burden the State administrative process. In the meantime the State's ability to provide necessary services would be undermined, and it might be required to make payments which it would be unable to recover later.

■■■ After balancing the relevant factors in light of the common law tradition, we conclude that Riblet's property interest in the contract is adequately protected by the availability of a breach of contract action subsequent to the termination of the contract by the State. We hold that the timing of the hearing in such an action comports with due process, so that Riblet need not be accorded a

hearing prior to termination of the contract. Our conclusion is supported by our firm belief that the guarantee of due process was never intended to supplant the common law of contracts. *See Parratt v. Taylor,* 451 U.S. at 544 (discussing tort law in the context of the fourteenth amendment).

In these circumstances, the National Constitution provides no greater protection than does our State Constitution. *See, e.g., Signet Const. Corp. v. Borg,* 775 F.2d 486 (2d Cir. 1985). Therefore, we need not consider Riblet's fourteenth amendment claims separately.

- *Remanded.*

All concurred.