Original
No. 88-355

## PETITION OF WAYNE BREAU
### (New Hampshire State Board of Education)

November 13, 1989

*James F. Allmendinger*, of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for the petitioner.

*John P. Arnold*, attorney general (*Claire L. Gregory*, attorney, on the brief and orally), for the State.

SOUTER, J. The certiorari petitioner seeks review of the revocation of his teaching credential by the State Board of Education for "lack of good moral character," N.H. ADMIN. RULES, Ed 506.04. He claims that the board acted illegally and abused its discretion, both in relying upon findings of fact made by a Canadian administrative body, and in purporting to justify its decision independently on other evidence presented to it. We affirm the order insofar as the board rested its decision on the foreign findings.

Postponing for the moment questions about evidentiary sufficiency and the degree of recognition owed to factual determinations reached by foreign administrative bodies, we read the record supplied by the board of education as indicating the following facts. For over ten years prior to 1986, the petitioner, Wayne Breau, taught in the school district of Harvey Station, New Brunswick, Canada. In the 1984–85 school year his employment as a physical education teacher in Harvey High School was interrupted by a two-day suspension without pay for "correspondence . . . of an unprofessional nature" addressed to a student. Breau denied writing the note in question but accepted the suspension. Four months later, as a consequence of "concerns . . . raised in the community and presented to the school board and the district superintendent," Breau was issued guidelines for professional behavior, which included rules against being alone with students, or having physical contact or encouraging familiarity with them.

School officials subsequently received allegations that Breau was behaving inappropriately with female students, and on January 10, 1986, the district superintendent met with him personally to inform him of the nature of the allegations, and of "the fact that . . . the

matter appeared to require further investigation." The same day, the superintendent sent a supervisor from his office to the high school to interview certain female students to ascertain whether they had any "first-hand information" about "improper or unprofessional conduct by a teacher or teachers."

The school's principal and parents of some of the girls questioned were present during the interviews, each of which began with the supervisor's explanation that the superintendent had been told that the girl "might have information" on the subject. The supervisor stressed that his only interest was in hearing about any improper acts directly experienced or witnessed, to the exclusion of "gossip or second hand information." The supervisor later stated that no one attempted to pressure any student or to influence her response by making reference to any particular teacher. When a student made a statement on the subject of the inquiry, the principal took notes, which the student signed at the end of the interview.

The five students interviewed that day variously charged that Breau had been seen placing his hands inappropriately on a female student in his office, and that more than once he had met with girls behind his closed office door with the shades drawn. He was said to have made remarks to female students, specifically quoted in the notes, referring to the attractiveness of various portions of their bodies and expressing his desire to see and touch them. After receiving these reports, the superintendent ordered further investigation.

On January 18, 1986, the supervisor and the school's vice-principal again interviewed the students seen the previous week, together with a sixth girl. As the interviewers later described it, they followed the same procedure employed before. The students supplemented the earlier allegations with further accounts that Breau had touched girls' breasts and buttocks, had played "footsies" with a student in a classroom, had given one of them a necklace, had called another at her home, and had invited students to join him for vacations or ski trips.

On January 20, 1986, the supervisor, principal, and vice-principal held similar interviews, save for the absence of parents, with two more girls. One said Breau had asked her what another girl was like in bed, while the other quoted Breau as having expressed a desire to observe her body. Each described Breau's arrangements for a ski trip, which, one of them stated, would give Breau the opportunity to drink alcohol with students in a hotel.

On January 30, 1986, the superintendent reported the results of the interviews to the Harvey Station Board of School Trustees, which voted to suspend Breau with pay for fourteen days and give him a chance to resign as an alternative to being fired as of February 18. On February 3, 1986, the superintendent wrote to Breau on behalf of the trustees advising him of his dismissal, premised on these findings:

> "[O]ur investigation has satisfied us that you have been guilty of improper conduct towards students. Specifically, we are satisfied that on a number of occasions you have made inappropriate or sexually suggestive statements to a number of female students. You have also had inappropriate contact with female students, by touching or pinching female students in the breast, rib and bottom areas. You have attempted to invite a number of female students to accompany you on a ski weekend with other students, to involve a motel stay and drinking.
>
> You have also been reported to have given personal gifts to students, and to have asked students to go to bed with you. You have been seen in your physical education office touching and embracing female students. You have engaged in playing 'footsies' with female students in the classroom. You have called female students at home to pursue your personal goals. You have taken female students into your gym office for extended periods, with the curtains closed for no apparent reasons. You have exchanged personal 'notes' with female students which clearly evidence improper intentions on your part."

Breau contested his dismissal by filing a grievance under the terms of a collective agreement between the government of New Brunswick and the New Brunswick Teachers' Federation. A union representative went with Breau to the grievance hearing held by the trustees, at which Breau spoke on his own behalf. When the trustees affirmed their earlier dismissal, Breau was given a package of "documentation required in preparation of a grievance procedure." This package has been described without contradiction as containing copies of the written notes of the students' statements, but with their names deleted. Evidence in the record indicates that the union chose not to support Breau in any further challenge to the trustees' action, and Breau litigated the matter no further.

The New Brunswick Department of Education was apprised of the circumstances of Breau's dismissal, and in July, 1986, the superintendent wrote to the New Brunswick Minister of Education recommending that Breau's license to teach be suspended or cancelled. The minister wrote to Breau, giving him an opportunity to submit any written documentation prior to the minister's decision, and advising of appeal rights in the event the decision was unfavorable to Breau. Breau replied, adverting to the weakness of what he called the "circumstantial" evidence against him, denying the appropriateness of further action in view of his plans to find work outside the province, and asking to be spared any further trouble.

During the same month of July, 1986, Breau was hired by the School District of Berlin, New Hampshire, where he taught physical education and earth science for the ensuing school year. He received favorable evaluations from district officials and was hired for a further year.

Near the end of Breau's first year as a Berlin teacher, in May, 1987, the lieutenant governor of New Brunswick gave "his approval for the Minister of Education to cancel for cause the Teacher's Licence of" Breau and one other teacher, named McLaughlin. On July 2, 1987, the minister wrote Breau to this effect, but the envelope addressed and sent to Breau's by-then obsolete New Brunswick address contained a similar letter addressed to McLaughlin. When the minister's mistake was discovered, he sent Breau a second letter at the old New Brunswick address, advising of the cancellation and of the right under the New Brunswick Schools Act to appeal within fifteen days. Breau had by then arranged with his father-in-law to have mail forwarded to New Hampshire at infrequent intervals, and the record does not disclose the date Breau actually received the minister's letter. Breau's later correspondence to the minister indicates, in any event, that he made no effort to appeal when the correct letter actually reached him.

Breau claims that his first actual notice of the New Brunswick cancellation came from an official of the New Hampshire Department of Education (DOE). DOE was notified on August 3, 1987, of the May cancellation. Although DOE nonetheless certified Breau to teach for the 1987–88 school year, one of its officials proceeded to enquire into the background of the New Brunswick action by writing to a member of the Harvey board of trustees and to the deputy minister of education.

The Harvey trustee responded with support for Breau, whom he described as an excellent teacher, whose license had been cancelled at the behest of parents of some female students who alleged that Breau had made improper remarks. The deputy minister replied with a copy of Breau's termination letter, from which we quoted above, and advised that Breau could have had further review of his grievance, despite the lack of union support, but chose not to seek it.

In October, 1987, DOE informed Breau that his teaching credential would be revoked. When Breau declined to acquiesce in this action, the commissioner of DOE advised Breau that he would petition the State Board of Education under its regulation Ed 506.04 for revocation of Breau's teaching certificate for cause, defined in the regulation as including "lack of good moral character." At the same time, the Superintendent of the Berlin Public Schools advised Breau that he supported DOE's enquiry into Breau's fitness to retain his teaching license, noting a report of an incident at Berlin High School the previous February, when Breau was alleged to have behaved improperly toward a female student.

Breau exercised his right to a hearing before the State board, and on November 24 he also wrote to the New Brunswick Department of Education asking for the opportunity to take a late appeal from the cancellation of his teaching certificate there. He described the vicissitudes of the mail that had brought him notification of the minister's action and sought leave to appeal in aid of his efforts to make a new life for his family and himself in New Hampshire. By letter dated December 7, 1987, his request was denied on the grounds that he had been given adequate notice of the decision, and that the New Brunswick Schools Act did not authorize extensions of the appeal period.

On December 16, 1987, the State board held its first hearing on the commissioner's petition to revoke Breau's New Hampshire teaching license. The commissioner submitted documentary evidence of the various actions taken against Breau in New Brunswick, including the findings quoted above, together with the letter to Breau from the Berlin superintendent charging an instance of improper behavior with a female student there. Breau testified on his own behalf, denied any wrongdoing, and submitted affidavits tending to refute the Berlin allegation and attesting to his good moral character. The board deferred its decision while awaiting further evidence from New Brunswick, which was presented in April 1988. This included copies of the notes of the student interviews, affidavits describing the manner in which the

interviews were conducted, and an opinion from a solicitor in the office of the Attorney General of New Brunswick that Breau could have appealed his dismissal further than he did, with or without the approval of his union. Breau again testified and answered questions.

After Breau's counsel had submitted requests for findings, and the commissioner of DOE had responded, the State board voted on June 15, 1988, to revoke Breau's teaching credential. The board determined that the "New Brunswick process [had] allowed Mr. Breau a full and fair opportunity to adjudicate his dismissal and to appeal the revocation of his teaching credential," and it adopted the findings of fact originally made by the Harvey trustees. Although the board also claims to have made an "independent evaluation of the evidence" in support of its action, the keystone of its order was a ruling of law that "[t]he conduct which served as the basis for dismissal of Mr. Breau by the Harvey Station School Board [of Trustees] and as the basis for the revocation of his teacher's license demonstrates a lack of good moral character and constitutes good cause for revocation of Mr. Breau's teaching credential pursuant to N.H. Code Admin. R. Ed 506.04." After the board had denied reconsideration of its revocation order this appeal followed by petition for writ of certiorari, there being no statutory provision for review under the statute governing appeals from administrative agencies, RSA chapter 541.

■ Our certiorari jurisdiction to review administrative orders limits us to enquiring whether the agency "exceeded its jurisdiction or authority, otherwise acted illegally, abused its discretion, or acted arbitrarily, unreasonably or capriciously." *Petition of Bagley*, 128 N.H. 275, 282, 513 A.2d 331, 336 (1986). Breau invokes this jurisdiction to attack the order as resting on legal error and abuse of discretion, insofar as it was grounded either on the prior Canadian administrative action or on the State board's claim to have made an independent evidentiary determination. The State responds that the board legitimately relied on a New Brunswick judgment, that it properly afforded comity to the New Brunswick determination, and that the board made a defensible independent determination.

Because we sustain the board's recognition of the final New Brunswick administrative judgment, we have no occasion to consider the adequacy of the independent evidentiary determination claimed by the board. And since Breau does not deny that the facts underlying the Canadian actions could, if accepted, be taken to indicate the want of "good moral character" that the State

regulation equates with cause for revocation, we regard Breau's attack on the board's recognition of the Canadian proceedings as raising one issue: the lawfulness of the State board's reliance on the foreign administrative judgment for the purpose of adopting the factual predicates of that judgment as grounds for the board's own administrative action.

Our treatment of this issue must start with some threshold clarification of the Canadian action relied upon, the nature of the reliance, and the principles on which it should be judged. We have already spoken of the two New Brunswick administrative proceedings resulting, respectively, in the trustees' order dismissing Breau from his teaching job and the minister's order cancelling his license to teach. Each of these orders rested on the facts found by the Harvey trustees, as constituting cause for the action taken.

We understand the board to have relied upon these same findings of fact. This becomes clear upon realizing that neither of the Canadian orders, by its terms, is capable of enforcement outside the jurisdiction in which it was rendered. The order of the Harvey trustees simply terminated a particular employment relationship, and the minister's order revoked a right to engage in teaching within the province. When, therefore, the board recognized the minister's order or judgment, it is clear that the board was not enforcing that judgment, but was relying on it insofar as it (a) rested on the findings of fact made by the Harvey trustees and (b) functioned as an adjudication of Breau's status that was sufficient to invest those earlier findings with finality. Accordingly, the State board's order recited that "we accept the New Brunswick findings as final findings of fact," and the board's use of the Canadian findings thus served the affirmative purpose of "offensive" collateral estoppel.

To be sure, such an estoppel is usually invoked not only to establish previously determined facts for use in subsequent litigation, but to preclude the relitigation of those facts, whereas in this case the board never denied Breau the opportunity to introduce further evidence, including evidence contrary to the Canadian findings. But, in the end, the board's adoption of those findings as "final findings of fact" satisfying DOE's burden to make a prima facie case for revocation of Breau's license was indistinguishable from a classic invocation of offensive collateral estoppel, and we therefore proceed to a more detailed examination of the doctrine and the circumstances in which it may be applied.

Under conditions to be discussed below, collateral estoppel may be invoked to bar a party to a prior final judgment from relitigating any fact actually determined in the prior litigation, *see Caouette v. Town of New Ipswich*, 125 N.H. 547, 554–55, 484 A.2d 1106, 1111–12 (1984). When collateral estoppel is applied "offensively," it results in determining an issue of fact over the actual or potential objection of a present respondent, by applying the determination reached in a prior proceeding in which the respondent was also a party, *see* RESTATEMENT (SECOND) OF JUDGMENTS § 29, reporter's note at 299. Thus the board in this case relied on the provincial minister's order as expressing the terms of a final administrative judgment, for the purpose of establishing the facts on which that judgment rested, as stated in the findings made by the Harvey trustees.

In addressing the legality of the board's reliance, the parties have referred to the "comity" due to the acts of Canadian jurisdictions or to orders of their officials, and we read the State's brief as arguing that the obligation of comity could supply a basis for affirming the board's reliance on the foreign findings of fact even under circumstances that would not support the application of collateral estoppel as between two domestic actions. "Comity," however, refers merely to the recognition, to whatever degree, or for whatever purpose, accorded by the agencies of one government to the legislative, executive, or judicial acts of another, *see Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895), and the substantive vacuity of the concept is reflected in our recent statement that the obligation of comity is consistent with judicial discretion to decline any recognition of foreign governmental acts that would violate strong public policy of this State or leave its courts unable to render complete justice, *see Vazifdar v. Vazifdar*, 130 N.H. 694, 697, 547 A.2d 249, 251 (1988); *see also Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain."). We therefore follow the lead of the Restatement (Third) of the Foreign Relations Law of the United States (hereinafter Restatement of Foreign Relations Law), which minimizes reliance on comity, and concentrates instead on the substance of such issues of enforcement or preclusion as might otherwise be glossed over by the use of the term. Like the Restatement, then, we will speak no further of comity, but will turn instead to consider specifically the conditions under which

judgments are recognized for the purpose of subsequently establishing the facts upon which they rest.

As we have summarized the most basic of those conditions, if a prior judgment is to estop a party in a later action or proceeding from relitigating an issue determined in a prior action resulting in final judgment,

> "the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared as a party in the first action, or have been in privity with someone who did so. *See Duncan v. Clements*, 744 F.2d 48, 51 (8th Cir. 1984). These conditions must be understood, in turn, as particular elements of the more general requirement, that a party against whom estoppel is pleaded must have had a full and fair prior opportunity to litigate the issue or fact in question. *See Sanderson v. Balfour*, 109 N.H. 213, 216, 247 A.2d 185, 187 (1968); *Duncan v. Clements supra*."

*Daigle v. Portsmouth*, 129 N.H. 561, 570, 534 A.2d 689, 693 (1987). Nothing in these principles is incompatible with their application to determine the recognition properly due to a judgment rendered in a foreign national state, and, as the parties have assumed, Canadian judgments are generally cognizable in courts of the United States, *see* RESTATEMENT OF FOREIGN RELATIONS LAW § 481 (final judgment of court of foreign state determining entitlement to money, status, or property interests entitled to recognition in United States courts); RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 98 (a valid foreign judgment will be recognized in the United States), and in most respects will be accorded "the same degree of recognition to which sister State judgments are entitled," *id.* comment *b*, at 298. Although the notes of the reporter of the Restatement of Foreign Relations Law observe that the "rule is less clear with regard to decisions of administrative tribunals," § 481 comment *f*, at 596, and with respect to recognition solely for purposes of collateral estoppel, *id.* reporter's note 3, at 599–600, no issue has been raised here about the cognizability of a Canadian administrative judgment, as such, presumably because our domestic law accords preclusive effect to administrative judgments under the same conditions that apply to the judgments of a court, *see Morin v. T. H. Valliere Co.*, 113 N.H. 431, 433–34, 309 A.2d 153, 155 (1973).

Although Breau's challenge to the recognition of the provincial minister's judgment does not invoke any of the specific conditions mentioned above, we understand him to allude to the overriding requirement of a full and fair opportunity for prior litigation when he cites § 482(1)(a) of the Restatement of Foreign Relations Law, that a court of the United States (and, *a fortiori*, an administrative tribunal) may not recognize a foreign judgment that was "rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law." While we do not necessarily equate the requirements of due process with what our prior cases have spoken of as full and fair opportunity, we will treat Breau's claims that the Canadian administrative procedure deprived him of due process as addressing the full and fair opportunity requirement as well.

While Breau expresses his objections to the Canadian procedure in various ways, we understand that his claims of incompatibility with our notions of due process (and, we will assume, of the "full and fair opportunity" standard) boil down to two. He asserts that Canadian procedure failed to provide him with a reasonable opportunity to confront the particular students who gave the evidence against him in support of the factual findings on which both the Harvey trustees and the provincial minister of education acted, and failed to provide him with rights to appeal either the local findings and order or the provincial minister's order.

The State raises no question about the applicability of due process guarantees, in a domestic legal context, either to the termination of public employment on the terms contained in Breau's New Brunswick teaching contract (which is not before us in its entirety), or to the revocation of his teaching certificate. *See Richardson v. Chevrefils*, 131 N.H. 227, 237, 552 A.2d 89, 95–96 (1988). Nor does the State deny that our notions of due process would have required an opportunity to identify the complainants and subject them to cross-examination. *See Bedford Bank v. State*, 116 N.H. 649, 651, 365 A.2d 734, 735 (1976).

The State does, however, deny that Breau was deprived of opportunities to avail himself of what due process would thus require. Specifically, the State asserts that applicable provisions of the collective agreement and Canadian statutory law afforded him rights of confrontation and appeal from both the local and provincial actions, and it is on these points about the provisions of the contract and governing statutes that the parties have joined issue.

Our analysis of the contractual and statutory provisions supports the State's position that, under § 59.01 of the collective agreement covering Breau's employment, he had the right to refer any unsatisfied grievance over his dismissal to a process of adjudication regulated by the New Brunswick Public Service Labour Relations Act. Breau's grievance, if so referred, would have been heard either by a neutral adjudicator or by a board of adjudication comprising two members nominated by the respective parties and a neutral adjudicator. New Brunswick Public Service Labour Relations Act § 95(1). Either the single adjudicator or the board would have had "all of the powers and privileges that commissioners have under the *Inquiries Act.*" *Id.* § 97(2). *See also* The New Brunswick Schools Act §§ 47(3), 48 (providing a virtually identical adjudicative and appellate procedure). This authority includes the power to "hear and accept any relevant evidence," New Brunswick Inquiries Act § 8, and to "require the attendance . . . of any person whose evidence may be material." *Id.* § 4(1). Thus, Breau could have appealed his dismissal and engaged in adjudication that would have included the opportunity to request confrontation with the students in question, and would have provided a forum to redress whatever deficiencies and errors he claimed to have infected the local proceeding.

To be sure, the power to summon the witnesses for confrontation would have belonged to an adjudicator or board of adjudication, not subject to Breau's control, and in theory it might have been open to the adjudicator to refuse to summon the witnesses. But in the absence of any evidence or indication that such summonses would have been withheld, we are unwilling to assume that a request from Breau for the attendance of witnesses on whose testimony the entire case against him rested would have been denied by a neutral magistrate in a common law jurisdiction. We therefore conclude that Breau's opportunity to obtain appellate review of his dismissal and the attendance of witnesses for cross-examination was sufficiently compatible with standards of a fair hearing and due process.

Breau's argument that he had no such rights of review and evidentiary adjudication has no merit. Relying on the evidence that the union would not support him in seeking further adjudication after the hearing before the Harvey trustees, he would have us conclude that he had no opportunity for such adjudication, asserting in his brief that "Section 91(2) of [the Labour Relations Act] states 'an employee is not entitled to present any grievance . . . unless he has the approval of and is represented by the bargaining agent [*i.e.,* the union].'" By omitting material from the quotation of § 91(2),

indicated by the ellipsis, however, Breau's counsel substantially distorts its meaning.

The full text of the relevant portion of § 91(2) reads that "[a]n employee is not entitled to present any grievance relating to the interpretation or application in respect of him of a provision of a collective agreement or any arbitral award unless he has the approval of and is represented by the bargaining agent . . . ." More to the point, a similar provision governs his right to adjudication if the outcome of the grievance procedure is unsatisfactory to him. Thus, § 92(2) provides that

> "[w]here a grievance that may be presented by an employee to adjudication is a grievance relating to the interpretation or application in respect of him of a provision of a collective agreement or arbitral award, the employee is not entitled to refer the grievance to adjudication unless the bargaining agent . . . signifies . . . its approval of the reference . . . and . . . its willingness to represent the employee . . . ."

Section 59.02 of the collective agreement covering Breau contained a virtually identical limitation.

The limitation has no application, however, to a teacher's appeal of dismissal for cause. Section 92(1) of the Labour Relations Act distinguishes between adjudication of unsatisfied grievances "with respect to . . . the interpretation or application in respect of him of a provision of a collective agreement or an arbitral award," on the one hand, and grievances with respect to "disciplinary action resulting in a discharge . . . ," on the other. The collective agreement draws an identical distinction between grievances over dismissal and those arising from interpretation and application of the contract. Given this express and unmistakable distinction, Breau has no reasonable basis to claim that the requirement of union approval for appealing issues over interpreting and applying a collective agreement with respect to a teacher has any application to appeals from dismissals. *Accord* New Brunswick Schools Act § 47(4) (no restriction on teacher's right to appeal dismissal to board of reference). Breau is wrong, therefore, in claiming that review and confrontation were foreclosed by the union's antipathy.

When we turn to consider Breau's position after the cancellation of his teaching license, the law is equally clear that he had a right to appeal, with a further opportunity to seek an evidentiary hearing and the attendance of witnesses claimed to have evidence of the underlying disputed facts. Section 10(5) of the Schools Act provides that within fifteen days of notice by registered mail that his teaching license has been cancelled for cause, a teacher may appeal

to a board of reference, comprising a nominee of the teacher and of the minister, and a chairman appointed by those two, *id.* § 10(6). Just like a board of adjudication on reference from a dismissal, a board of reference hearing an appeal from cancellation of a license "has . . . all of the powers and privileges that commissioners have under the *Inquiries Act,*" *id.* § 48, which, as we have already seen, include the power to summon witnesses to give evidence.

Breau does not deny this, nor does he deny that, when the Minister originally notified him in 1987 that cancellation was being considered, he was advised that he could appeal any adverse decision. He claims, however, that appeal was effectively foreclosed by the minister's failure to provide him with notice of cancellation in sufficient time to allow him to act within the fifteen-day appeal period provided by the statute.

█ It is true, of course, that the minister's first notice, in July 1988, contained a letter addressed to another licensee, and should not be considered notice to Breau. But the second, corrective letter, of August 1988, was adequate. While Breau claims that his father-in-law, who received the letter, failed to forward it promptly, that fault is chargeable to Breau, not to the minister of education. Breau had known for over a year that his status as a certified teacher in New Brunswick was in jeopardy, and that his opportunity to appeal any decision adverse to him would be limited to fifteen days, but he had failed to provide the minister with a current address to which notice could be sent. Under New Hampshire law, the failure is attributable to him, not to the minister, *see State v. Fraser,* 116 N.H. 642, 643, 365 A.2d 1046, 1047 (1976), and in the absence of proof of different foreign law, we are entitled to assume that the New Brunswick rule made an equally sensible allocation of responsibility, *see Adams v. Thayer,* 85 N.H. 177, 179, 155 A. 687, 689 (1931) (party relying on foreign law differing from law of forum bears burden of proving its content).

█ In sum, Breau had two opportunities to appeal the findings against him and to request the appearance, for personal examination, of the witnesses to the events claimed to underlie both his dismissal and the cancellation of his license. The failure to avail himself of these opportunities rests on him and raises no bar to the application of collateral estoppel to establish in the New Hampshire forum the facts upon which the ultimate New Brunswick administrative judgment rested.

*Affirmed.*

THAYER, J., did not sit; the others concurred.