Division for Children and Youth Services
No. 85-248

## PETITION OF LANA AND LEON BAGLEY

(New Hampshire Division for Children and Youth Services)

July 9, 1986

*Kahn & Brown*, of Nashua (*Kenneth M. Brown* and *Ellen S. Friedman* on the brief, and *Ms. Friedman* orally), for the petitioners.

*Stephen E. Merrill*, attorney general (*Susan Saggiotes*, attorney, on the brief and orally), for the Division for Children and Youth Services.

BATCHELDER, J. In this petition for a writ of certiorari, Lana and Leon Bagley challenge a decision of the New Hampshire Division for Children and Youth Services (the "division") upholding a finding by the division's Nashua district office that a report of child neglect in the petitioners' household was "founded". *See* RSA 169-C:29 to :39 (Supp. 1985). We grant the petition, vacate the decision, and remand for proceedings consistent with this opinion.

This case presents important social and constitutional issues. At center stage are our government's laudable efforts to combat one of the great evils of the day: the abuse and neglect of children. In the background, however, looms the image of Big Brother. Our role is to decide whether our constitution permits the government to give its imprimatur to reports of child abuse and neglect—and to store and use those reports—without affording to those accused notice and a meaningful opportunity to be heard.

Lana and Leon Bagley are married and have five children. In October 1984, the ages of these children ranged from two to eleven. At that time Lana Bagley was caring for several children, in addition to her own, in her Nashua home. Leon Bagley, a postal service employee and a Special Forces veteran and reservist, kept a variety of weapons and ammunition in the house, including rifles, shotguns, pistols, and a revolver.

On the afternoon of October 14, 1984, Mrs. Bagley and the children returned home from shopping to find Mr. Bagley asleep. Mr. Bagley had been drinking heavily. Mrs. Bagley roused her husband, who became angry, followed his wife into the kitchen, and pushed her. Mr. Bagley then returned to the master bedroom and began to handle one of his weapons. Hearing this, Mrs. Bagley collected her children and left the house.

Mrs. Bagley sent the children to her mother's house and telephoned the Nashua Police Department. The police arrived, spoke to Mrs. Bagley, and took positions outside the house. One of the officers then telephoned Mr. Bagley. Inside the house, Bagley pointed a

semi-automatic rifle at his ringing bedroom telephone and fired two rounds into it. The telephone continued to ring. Bagley picked up the receiver, spoke to the officer, and agreed to leave the house unarmed.

The police interviewed Bagley, who admitted that he had shot the telephone. Bagley then entered the house with the officers and showed them the newly perforated telephone, the rifle, and many of his other weapons. The police, believing that the Bagleys had reconciled their differences, advised Mrs. Bagley of her right to file a domestic violence petition, issued a summons charging Mr. Bagley with discharging a firearm within the city limits, and departed.

On October 18, 1984, the division's Nashua district office received a telephone call regarding the Bagley household. The informant said that Mr. Bagley had allegedly discharged a shotgun in the house, and expressed concern regarding Mrs. Bagley's lack of a daycare license. The following day a division employee telephoned the Nashua Police Department and was provided with the details of the incident. A division social worker, Maureen Ricker, was assigned to investigate the matter.

On October 26, Ricker visited the Bagley home and interviewed Mrs. Bagley. Ricker explained that the agency had received a report "concerning guns in the house and potential violence." Mrs. Bagley admitted that the incident had occurred, but assured Ricker that she and her children were not in danger. She also expressed her concern that Ricker's investigation would affect her eligibility for a daycare license. She agreed to confer with her husband and to meet again with Ricker.

On October 29, both of the Bagleys went to the district office. Mrs. Bagley explained to Ricker that since the incident the guns had been transferred to her mother's house, where they would remain at least until the Bagleys obtained a secure container for them. Mr. Bagley recounted the incident and said that it would not happen again. He agreed to attend counseling sessions with his wife. Mr. Bagley also stated that "he was a gun expert, that he knew how to handle guns, and that he did not feel that the guns being in the house presented a danger to the children."

On November 8, Ricker returned to the Bagley residence and interviewed three of the children. In the following weeks, Ricker twice met with Mrs. Bagley and her attorney.

On or about November 21, 1984, the district office telephoned the Bagleys. The Bagleys allegedly were told that the office had found that "(1) the children were in hazardous living conditions, and (2) Mr. Bagley was a danger to others, in conflict with the community and had used defective judgment." The record does not contain any

reference to this call. The Bagleys did not receive written notice of the division's findings.

On December 14, 1984, the Bagleys' lawyer wrote Raymond Barrett, administrator of the bureau of children, and requested a hearing. Barrett replied by letter. He notified the Bagleys that an administrative review panel consisting of three disinterested social workers would hear the case, specified the date, time, and location of the hearing, and explained its format. He also stated that before the date of the panel review the Bagleys could ask to review their record at the district office. In a second letter to the Bagleys, dated March 12, 1985, Barrett stated, "[S]ince Mr. Bagley has been listed as the alleged perpetrator in our records, a review of the findings can not take place unless he is present, since the purpose of the panel review is to examine the circumstances of the finding regarding Mr. Bagley."

The hearing occurred on March 26, 1985. Both the Bagleys and their attorney attended. At the beginning of the hearing the panel chairperson stated that the division had made a finding of neglect based on "hazardous living conditions." The panel members heard testimony from Ricker and her supervisor, and much of the police report of the shooting incident was read into the record. The Bagley's attorney was not permitted to cross-examine the division employees, but was allowed to ask them questions via the panel chairperson. The Bagleys then testified, and were questioned by the panel members. The Bagleys' attorney made a final statement, and the panel adjourned.

On April 1, 1985, the panel, in an inter-department communication to Barrett, recommended that the decision of the district office be upheld. Barrett, in an April 5, 1985, letter to the Bagleys, accepted this recommendation and upheld the district office's decision. He gave no reasons for his determination.

The Bagleys next requested a "fair hearing." Dagny Fecht, administrator of the office of fair hearings, reviewed the record, the tape recording of the hearing before the panel, the panel's recommendation to Barrett, and Barrett's decision. On May 7, 1985, Fecht upheld the decision in a written determination that included factual findings. This petition followed.

The Bagleys raise three arguments on appeal. They contend that the division erred in deciding that the report of neglect was founded, in that (1) there was no evidence that the children's health had suffered or had been very likely to suffer "serious impairment," RSA 169-C:3, XIX(b) (Supp. 1985), and (2) one parent was at all times exercising proper parental control over the children. They also argue that the division has abridged their constitutional rights

to due process of law. Because we agree with the last of these arguments, we do not consider the first two.

This case involves the Reporting Law, a subdivision of the Child Protection Act. RSA 169-C:29 to :39 (Supp. 1985). The reporting law requires "any . . . person having reason to suspect that a child has been abused or neglected" to make a report to the division. RSA 169-C:29, :30 (Supp. 1985). Anyone making such a report in good faith enjoys immunity from liability. RSA 169-C:31 (Supp. 1985); see State v. Howland, 125 N.H. 497, 484 A.2d 1076 (1984).

When the division receives a report of abuse or neglect, it must begin a child protective investigation within seventy-two hours of receipt of the report. RSA 169-C:34, I (Supp. 1985). In the course of its investigation the division determines the composition of the family or household, the risk to each child posed by the existing home environment, and the protective treatment and ameliorative services necessary to prevent further abuse or neglect and improve the home environment. RSA 169-C:34, II (Supp. 1985). The division also determines whether the report is "founded"—whether there is "probable cause" to believe that any child in the family or household is abused or neglected. RSA 169-C:34, II(ii) (Supp. 1985). This determination includes identification of the "harm or threatened harm to each child, the nature and extent of present or prior injuries, abuse or neglect, and any evidence thereof, and . . . the person or persons apparently responsible for the abuse or neglect." Id. "Probable cause," as used in the Child Protection Act, means "facts and circumstances based upon accurate and reliable information, including hearsay, that would justify a reasonable person to believe that a child subject to a report . . . is abused or neglected." RSA 169-C:3, XXIII (Supp. 1985).

Once it completes an investigation the division may refer the case to law enforcement authorities for possible criminal prosecution, and must do so if the abuse or neglect causes serious bodily injury to a child. RSA 169-C:38 (Supp. 1985); see also Laws 1986, 225:1 (effective July 6, 1986). It also may file a petition in district court alleging abuse or neglect. See RSA 169-C:7 (Supp. 1985).

In addition, the division keeps a record in the central registry of the report and investigation. RSA 169-C:35 (Supp. 1985). See generally Besharov, Putting Central Registers to Work: Using Modern Management Information Systems to Improve Child Protective Services, 54 CHI. [-] KENT L. REV. 687 (1978). The division administers the registry at two levels. Each district office maintains its own registry, and the division maintains a statewide registry, a compilation of the individual division registries. See N.H. ADMIN. RULES, He-C

6426.01(f). The statewide registry is in the process of being computerized.

For each report of neglect or abuse, a protection report form and a protection investigation form are completed and stored in the registry. The registry also contains a file of perpetrators. N.H. ADMIN. RULES, He-C 6426.01(f)(2). Records of "founded" reports are retained for seven years, records of unfounded reports for three. RSA 169-C:35 (Supp. 1985). The information in the registry is confidential and subject to rules on access promulgated by the director of the division. *Id.*; *see* N.H. ADMIN. RULES, He-C 6407.01–.09; *see also* RSA 170-G:8-a (Supp. 1985).

The present reporting law does not specify a means by which the subject of an abuse or neglect report and investigation may challenge a determination of the division. Between 1979 and 1983, such a subject was entitled, upon request, to receive a copy of all information contained in the registry pertaining to her case. Laws 1979, 361:2 (codified at RSA 169-C:35, *amended by* Laws 1983, 331:5). The subject could request the former bureau of child and family services to amend, expunge identifying information from, or remove the record of the report from the registry. If the bureau refused to comply with the request or did not act within thirty days, the subject had a right to a hearing before the board of appeals of the department of health and welfare. *Id.* If the bureau amended, expunged, or removed any record in the registry, it was required to mail written notice of its action to the subject affected. *Id.* If the bureau determined that a report of abuse or neglect was unfounded, all pertinent records were expunged from the registry within six months of the determination. *Id.*

Today none of these protective measures is provided for by statute. The subject of an abuse or neglect report is not entitled to notice either of the report or of the outcome of the subsequent investigation. The division's regulations, however, permit the release of information in a child abuse report to the perpetrator upon written request. N.H. ADMIN. RULES, He-C 6407.08. Even if the subject learns of the investigation's outcome, he or she has no statutory right to challenge it.

Once the division determines that a report of abuse or neglect is "founded," two outcomes are possible. The division may designate the matter as "founded, case opened" and open the case for services under its protection program. N.H. ADMIN. RULES, He-C 6426.01(m). If the division chooses this designation, it may file an abuse or neglect petition in district court. *See* RSA 169-C:7 (Supp. 1985).

The second outcome results when the division designates the case as "founded, problem resolved." This occurs when a reported inci-

dent of abuse or neglect is satisfactorily resolved during the investigation, or a referral to another community resource is made so that no further action by the division is necessary. N.H. ADMIN. RULES, He-C 6426.01(n). Because the report is deemed "founded," however, records of the report and investigation are deposited in the central registry.

The Bagley case fell into the "founded, problem resolved" category. Because the Bagleys transferred the guns to Mrs. Bagley's mother's house and obtained counseling, the division decided that no further action was warranted. The division did not refer the matter to a law enforcement authority, file a neglect petition, or impinge in any other manner upon the Bagleys' parental rights. Insofar as the division was concerned, the only tangible result of the affair was that records of the report and investigation were placed in the central registry.

The consequences of this result were not insignificant, however. The Bagleys allege that, because of the division's determination, Mrs. Bagley will never obtain a license to operate a daycare center, see RSA 170-E:4, III (Supp. 1985), and Mr. Bagley, who in the past has allegedly taught gun safety to young children, will never be permitted to work or volunteer in any activity involving children. In addition, after the investigation was concluded, Mrs. Bagley was asked to leave her position as a volunteer in the protective services program of the division of welfare.

We note that we may grant the Bagleys' petition only if the division exceeded its jurisdiction or authority, otherwise acted illegally, abused its discretion, or acted arbitrarily, unreasonably, or capriciously. See Runde v. City of Concord, 128 N.H. 175, 177, 512 A.2d 408, 409–10 (1986). Because the Bagleys have asserted both State and federal due process claims, we first will address those arising under the New Hampshire Constitution, and will rely on federal precedents merely for guidance. See State v. Ball, 124 N.H. 226, 471 A.2d 347 (1983).

Our constitution provides that no citizen "shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." N.H. CONST. pt. I, art. 15. We long have regarded "the law of the land" as synonymous with "due process of law." See Mayo v. Wilson, 1 N.H. 53, 54–55 (1817).

In determining whether challenged procedures satisfy the due process requirement, we employ a two-part analysis. First, we determine whether the challenged procedures concern a legally pro-

tected interest. Second, we determine whether the procedures afford the requisite safeguards. *Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 756, 423 A.2d 603, 605 (1980).

The division contends that in determining that the report of neglect was founded and entering its determination in the central registry, it infringed upon no constitutionally protected interest of the Bagleys. It points out that the central registry entry remains confidential, and has not in any way affected the Bagleys' legal relationship with their children. The division distinguishes the proceedings under review, which concern only its finding that the neglect report was founded, from other proceedings in which that finding might play a part, such as daycare licensing hearings pursuant to RSA chapter 170-E. It concedes that a protected property interest would be at stake in the latter cases, but denies that either a liberty or a property interest is implicated here.

The Bagleys identify part I, article 2 of the New Hampshire Constitution as the source of a property or a liberty interest that was jeopardized by the division's actions. That provision states that all citizens "have certain natural, essential, and inherent rights." The Bagleys contend that their natural rights as parents were affected by the division's actions, and hence were entitled to due process protection. *See Provencal v. Provencal*, 122 N.H. 793, 797, 451 A.2d 374, 377 (1982); *see also Bohn v. County of Dakota*, 772 F.2d 1433, 1435–36 (8th Cir. 1985), *cert. denied*, 106 S. Ct. 1192 (1986).

We disagree with this contention. None of the petitioners' "natural, essential, and inherent rights," as we have construed that phrase, is at stake here. This case does not involve a custody determination, as in *Provencal*, or an attempt to terminate parental rights, as in *State v. Robert H. _____*, 118 N.H. 713, 393 A.2d 1387 (1978). Had the division chosen to begin a neglect proceeding in district court, the Bagleys' natural rights would have been placed in jeopardy, because of the potential of a custody transfer. *See* RSA 169-C:19, I(b) (Supp. 1985). Here, though, no such potential existed, and the Bagleys' relationships with their children stand unaltered.

This conclusion does not resolve the matter, however. An interest need not be recognized as a "natural, essential, and inherent" right under part I, article 2 in order to be the subject of due process protection under part I, article 15 of the New Hampshire Constitution. *Cf. Duffley v. New Hampshire Interscholastic Athletic Association, Inc.*, 122 N.H. 484, 491–92, 446 A.2d 462, 466–67 (1982) (recognizing property interest in participating in high school athletic competition even though no "fundamental constitutional right" involved). Although not a fundamental parental right of the kind recognized in *Proven-*

*cal,* the Bagleys' asserted interest in not being determined probably to be—and designated in the central registry as—perpetrators of a reported incident of child neglect may nevertheless merit constitutional protection.

■■ The general rule is that a person's liberty may be impaired when governmental action seriously damages his standing and associations in the community. 16C C.J.S. *Constitutional Law* § 980, at 306 (1985). We have recognized that the stigmatization that attends certain governmental determinations may amount to a deprivation of constitutionally protected liberty. *See Clark v. City of Manchester,* 113 N.H. 270, 274, 305 A.2d 668, 672 (1973) (probationary employees); *State ex rel. Cunningham v. Ray,* 63 N.H. 406 (1885) (commitment of juvenile to industrial school); *see also Proctor v. Butler,* 117 N.H. 927, 933, 380 A.2d 673, 676 (1977) (recognizing stigmatization that accompanies involuntary civil commitment).

In the present case, the division in effect has labeled the Bagleys as neglectful parents. In investigating the quality of their family life and identifying them as the probable perpetrators of an incident of child neglect, the division exposed the Bagleys to "public opprobrium" and "may have damaged their standing in the community." *Bohn,* 772 F.2d at 1436 n.4. The existence of the record of the division's determination in the central registry poses additional dangers to the Bagleys. "[T]he register's records contain information about the most private aspects of personal and family life, which, if improperly disclosed, could stigmatize the future of all those mentioned in the report." Besharov, *supra* at 733. At the moment the division entered the record of its investigation in the central registry, the Bagleys' lives became a little more complicated and a little less free. *See* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 15–17 (1978).

The division argues that the confidential manner in which it maintains central registry records obviates any danger of stigmatization. There are degrees of confidentiality, however. If the records were intended to remain entirely confidential, there would be no reason to store them. Under its rules the division may in some circumstances exchange information with other agencies or individuals. N.H. ADMIN. RULES, He-C 6407.05. In the present case the information in the central registry apparently will prevent Mrs. Bagley from obtaining a daycare license. The division also fails to take into account the possibility of unauthorized disclosure of central registry records.

Today governments collect great quantities of data about their citizens, data which, when stored in computers, potentially are

available to large numbers of people. The dangers presented by governmental possession and use of inaccurate information are greater than ever. The principles of due process are our most effective shield against these dangers. In our zeal to prevent the abuse and neglect of children we ought not to forget them.

██ We hold that in determining that the report of child neglect was founded, and in entering and maintaining a record of this determination in the central registry, the division engaged in an official adjudication of the status of potentially injurious consequences and thus deprived the Bagleys of their "liberty" within the meaning of part I, article 15 of the New Hampshire Constitution. *Compare Wisconsin v. Constantineau*, 400 U.S. 433 (1971), *with Paul v. Davis*, 424 U.S. 693 (1976). *Cf. Bohn*, 772 F.2d at 1435–36; *Sims v. State Department of Public Welfare*, 438 F. Supp. 1179, 1192 (S.D. Tex. 1977), *rev'd on other grounds sub nom. Moore v. Sims*, 442 U.S. 415 (1979). *But cf. Cruz v. Commonwealth Department of Public Welfare*, 472 A.2d 725, 728 n.3 (Pa. Commw. Ct. 1984) (dictum).

██ We now turn to the second part of our inquiry: whether the challenged procedures afforded the requisite safeguards. In analyzing this problem we consider the following factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Appeal of Portsmouth Trust Co.*, 120 N.H. at 757, 423 A.2d at 605. We have concluded that the Bagleys' interest in not being labeled as neglectful parents was significant; that the risk of an erroneous deprivation of that interest was heightened because of the division's failure to provide adequate notice; and that the additional expense that providing such notice would have entailed was minimal.

The gist of the Bagleys' due process argument is that they did not receive (1) written notice of the division's determination; (2) notice of the reasons for the determination; or (3) notice as to whom the division had designated as the perpetrator in the reported incident of neglect. The lack of notice, they contend, impaired their ability to challenge the division's determination. We agree. In the absence of specific notice, confusion has reigned throughout these proceedings. The division has never definitively identified the basis of its finding or the person against whom the finding was made. Was the incident of neglect the shooting of the telephone, the presence in the house of loaded weapons, or a combination of both? Was the perpetrator Mr.

Bagley alone or both parents? No one is entirely certain. The division's failure to clarify its position rendered these proceedings fundamentally unfair.

When the Bagleys were notified by telephone of the division's determination, they allegedly were told only that "the children were in hazardous living conditions" and that "Mr. Bagley was a danger to others, in conflict with the community and had used defective judgment." The cryptic forms filed in the central registry fail to clarify the matter. The protection report form lists an "incident date" of October 14, 1984, but describes the "Estimated Duration of Situation" as "Over 6 months." The accompanying protection investigation form lists Mr. Bagley's role as that of "Alleged Perpetrator" and Mrs. Bagley as "Not Involved." The "type" of "neglect . . . or hazardous living" is designated as "Defective Judgment" and "Living in Hazard Cond.," with "Physical Abuse of Spouse/Fighting" and "Alcohol Problem" appearing as "Factors present."

In his March 12, 1985 letter to the Bagleys, Barrett stated that "Mr. Bagley [had] been listed as the alleged perpetrator in [the division's] records." At the hearing before the administrative review panel, one panel member stopped the proceedings and asked whether the finding was against Mrs. Bagley in addition to Mr. Bagley. She eventually was told that only Mr. Bagley's name was involved. Much of the discussion at the hearing pertained to the telephone-shooting and Mr. Bagley's drinking. The only evidence regarding the presence of loaded weapons came from the police report, which according to Mrs. Bagley contained "a lot of inaccurate information."

The panel, in its recommendation to Barrett, stated that "Mr. Bagley's drinking and use of firearms were a danger to the family," and did not mention Mr. Bagley's arsenal as a factor. Barrett's decision, addressed to both parents, gave no reasons for the determination. Fecht's fair hearings decision listed both parents as appellants and discussed both the shooting incident and the presence of the arsenal. In its brief to this court, the division stated that it had concluded that both parents had neglected their children and that it has listed both parents in the central registry. Finally, at argument the division agreed that a "fair interpretation" of its decision was that the presence of weapons, and not the shooting incident, was the basis of the finding of neglect.

■ ■ Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *City of Claremont v. Truell*, 126 N.H. 30, 35, 489 A.2d 581, 585 (1985). "To be considered adequate, the notice must give a reason-

ably complete statement of the information upon which the proposed action is based [and] the full reasons for that action . . . ." *Petition of Clark*, 122 N.H. 888, 891, 451 A.2d 1303, 1305 (1982). In addition, fairness requires that the notice specifically identify the person or persons affected by the action. In this case the division failed adequately to notify the Bagleys of the action it took or the reasons for that action.

 We hold that the notification procedures employed by the division did not afford the Bagleys the protections required by part I, article 15 of the New Hampshire Constitution. Because the division has acted illegally, we grant the petition.

 In the future, when the division determines that a report of child abuse or neglect is "founded, problem resolved," the division must provide written notice to the person determined to be the perpetrator of the incident of abuse or neglect. The notice must set forth the nature of the report and the reasons underlying the division's determination. In addition, the notice should identify the perpetrator as such. Finally, the notice should inform the perpetrator of his right of access to the information stored by the division, as well as his right to challenge the determination in an administrative hearing. If the determination is upheld after a hearing, the division must provide the perpetrator with a written statement of the reasons for its decision to uphold.

On remand, the division need not repeat the child protective investigation it made as a result of the report. It must, however, notify the Bagleys of its determination in the manner described above, and, if the determination is adverse to them, afford them a second opportunity to challenge it.

The Bagleys also challenge the manner in which the panel hearing was conducted. They argue that they (1) were not allowed to cross-examine witnesses; (2) were denied the right to effective assistance of counsel; and (3) never received an adjudication from an impartial and detached magistrate.

 These arguments are without merit. Although the division did not permit full-blown cross-examination at the hearing, the Bagleys' attorney was allowed to question each of the division's witnesses through the panel chairperson, to question her own witnesses, and to make a closing statement. The panel consisted of three division social workers with no prior knowledge of the case. Their recommendation was subject to the approval of the administrator of the bureau of children and to review by the administrator of the office of fair hearings. We perceive no constitutional infirmity in

those procedures, although the better practice would permit the subject or his or her counsel to cross-examine directly rather than through the chair within reasonable limits and scope.

Because the National Constitution provides no greater protection than does our State Constitution in these circumstances, we do not address the petitioners' fourteenth amendment claims. *See Whalen v. Roe*, 429 U.S. 589 (1977); *Paul v. Davis*, 424 U.S. 693 (1976); *Mathews v. Eldridge*, 424 U.S. 319 (1976).

> *Petition granted; decision vacated; remanded.*

All concurred.