Merrimack
No. 91-110

*In re* TRACY M.

April 23, 1993

*Nighswander, Martin & Mitchell, P. A.*, of Laconia (*William A. Whitten* on the brief and orally), for the petitioner.

*John P. Arnold*, attorney general (*Susan S. Geiger*, assistant attorney general, on the brief, and *Ann F. Larney*, attorney, orally), for the State.

*Audrey S. Hagerman*, of Bristol, guardian ad litem, joined in the State's brief.

BATCHELDER, J.    The petitioner, Wayne M., appeals the ruling of the Superior Court (*M. Flynn*, J.), issued in his appeal of the Franklin District Court's finding that an abuse petition brought by the New Hampshire Division for Children and Youth Services (DCYS) was substantiated by the evidence. *See* RSA 169-C:28. The superior court ruled that the petitioner had sexually abused his stepdaughter, Tracy, on sporadic dates between 1981 and July 1989. He raises three issues on appeal: (1) that RSA 169-C:13, which allows proof of abuse or neglect by a preponderance of the evidence, violates his due process rights under both the State and Federal Constitutions; (2) that the evidence at trial was insufficient for the court to find that he had sexually abused Tracy; and (3) that the court erred by not granting his request for a factual finding that certain behavioral indicators, enumerated in a handbook on sexual abuse, were rarely conclusive. Finding no error, we affirm.

On July 6, 1987, Tracy, who was then almost eleven years old, confided to a neighbor that her stepfather had been sexually abusing her

since she was five years old. The neighbor reported the abuse to DCYS. Dan Wayment, a DCYS child protective social worker, interviewed Tracy at the neighbor's home the next day. Because Tracy was afraid to talk about the abuse, Wayment asked her to write down what had happened. In response, Tracy wrote a twenty-page letter in which she explicitly described a variety of sexual abuses.

Based on Tracy's oral and written statements, an interview with her thirteen-year-old sister, who also described sexual abuse by her stepfather, and the statement of her mother that she believed her daughters were telling the truth, DCYS labelled the case "founded—problem resolved." Because the respondent was reported to be living in New Jersey, DCYS concluded that he no longer posed a threat to Tracy, hence the view that the problem was resolved. Tracy was subsequently referred to Dr. Maureen McCanty for a sexual abuse evaluation, which revealed "no evidence of physical injury."

For the next two years, DCYS worked with the family to provide intervention and counseling services, operating under the belief that the respondent was not in the family home and did not have unsupervised access to Tracy. Unbeknownst to DCYS, the respondent returned to New Hampshire sometime prior to May 1989, and spent time with Tracy's family in their trailer while living in the trailer across the road. On May 10, 1989, a neighbor reported that she heard sounds coming from Tracy's family's trailer and believed that Tracy was being raped by her stepfather. The local police responded and took Tracy to the New London Hospital, where a limited exam showed no evidence of sexual assault.

On July 24, 1989, after stealing cigarettes from her mother and fearing being punished, Tracy ran to a neighbor's home and reported that her stepfather had sexually assaulted her several weeks earlier. As a result of her allegations, she was removed from her home and placed in foster care. During an interview with Cathy Battistelli, the victim-witness coordinator for the Merrimack County Attorney's office, Tracy said that the letter she had written to Wayment in 1987 describing the earlier abuses was the truth. Tracy also told Battistelli that she was upset because she felt that no one ever did anything to help her after she wrote about the abuse.

Pursuant to RSA 169-C:7, DCYS filed an abuse petition in Franklin District Court on July 26, 1989. The district court found that the abuse petition was substantiated by the evidence, and Tracy was placed in protective custody at a group foster home. While talking to a clinical psychologist at the group home, Tracy recanted her statements about the abuse, voicing the concern that her mother could not

manage caring for her siblings without her help. She also told the resident director of the group home that she wanted to go home and, consequently, that she would lie to the judge about everything that had put her in placement.

On appeal from the final dispositional order of the Franklin District Court pursuant to RSA 169-C:28, the case was heard *de novo* in the superior court, which found that "Wayne M. sexually abused his stepdaughter, Tracy M., on sporadic dates during the period 1981 through July 1989." This appeal followed.

The petitioner first argues that the preponderance of the evidence standard in RSA 169-C:13 does not meet the due process requirements of part I, article 15 of the New Hampshire Constitution and the fourteenth amendment to the United States Constitution. As a preliminary matter, we analyze his argument under the protections afforded by part I, article 15. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). Because we have previously determined that part I, article 15 is at least as protective of individual liberties as the fourteenth amendment, *e.g., In re Eduardo L.*, 136 N.H. 678, 685, 621 A.2d 923, 928 (1993), we need not conduct a separate due process analysis under the Federal Constitution. *Ball*, 124 N.H. at 237, 471 A.2d at 354.

■ In determining whether a statutory burden of proof satisfies the due process requirement, we first decide whether the challenged procedure concerns a constitutionally protected interest, and if so, we then determine whether the procedure at issue afforded the requisite safeguards. *Riblet Tramway Co. v. Stickney*, 129 N.H. 140, 145, 523 A.2d 107, 110 (1987).

The petitioner argues that the private interest affected in this case is two-fold: his liberty interest in his standing in the community and his constitutional interest in the parent-child relationship, both of which are stigmatized by his being adjudicated an abuser of children. The State concedes that a petitioner normally has a constitutionally recognized liberty interest in being free from the stigmatization that attaches to one's reputation upon being labelled a child abuser, citing dicta from our opinion in *Petition of Bagley*, 128 N.H. 275, 283, 513 A.2d 331, 337 (1986). It argues, however, that the petitioner, by his prolonged absences from the family and his status as a stepparent, is not entitled to the due process protection generally afforded a natural or adoptive parent. The petitioner disagrees, yet cites only cases dealing with the rights of *parents* in their relationships with their children, offering no authority that the rights of stepparents are co-extensive, a significant issue of first impression for this court. Al-

though it appears doubtful that the rights of stepparents are coextensive with those of natural or adoptive parents, we are unwilling to decide issues in the absence of full briefing and argument by the parties. *E.g., Petition of Contoocook Valley Paper Co.*, 129 N.H. 528, 534–35, 529 A.2d 1388, 1392 (1987). Because we determine that due process would not be violated even if the petitioner were entitled to the same constitutional protections as a parent, we assume, for purposes of this opinion only, that the petitioner has a constitutionally protected interest in his relationship with Tracy.

■ We now turn to the second part of our inquiry: whether the challenged procedure afforded the requisite safeguards. To determine what process is due, we consider the following factors:

"(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Bagley*, 128 N.H. at 285, 513 A.2d at 338–39.

■ The purpose of RSA chapter 169-C, titled the Child Protection Act, RSA 169-C:1, is "to provide protection to children whose life, health or welfare is endangered and to establish a judicial framework to protect the rights of *all* parties involved in the adjudication of child abuse or neglect cases." RSA 169-C:2 (emphasis added). Consequently, we consider the interest of both the petitioner and the child in determining what process is due.

Regarding the second prong of inquiry, the petitioner maintains that the risk of an erroneous deprivation of his interest could not be greater, because the preponderance of the evidence standard is the easiest to meet. In support of this argument, he cites *In re Brenda H.*, 119 N.H. 382, 402 A.2d 169 (1979), in which this court held that "[g]iven the danger of unwarranted or harmful intrusion into family life, . . . the State must initially prove child abuse or neglect by clear and convincing evidence." *Id.* at 389, 402 A.2d at 174. The petitioner's reliance on *Brenda H.*, however, is misplaced. At the time *Brenda H.* was decided, the legislature had not yet established the burden of proof to be applied in an abuse or neglect adjudication. *See* RSA 169-C:13 (effective August 22, 1979). Moreover, although the *Brenda H.* court determined that the clear and convincing standard

would be appropriate in a case such as the one before us, it did not hold that such a standard was constitutionally mandated.

■ As noted above, but ignored by the petitioner, we must also consider the risk of erroneous deprivation to Tracy. Although the Child Protection Act was adopted to establish procedures to "[p]reserve the unity of the family whenever possible," RSA 169-C:2, I(b), it nevertheless seeks to "[p]rotect the safety of the child," RSA 169-C:2, I(a). If the court were to erroneously find that an allegation of abuse or neglect was unfounded in a given case because it employed a higher burden of proof, the harm to the victim of that abuse or neglect, as well as to the well-being of the family as a whole, could be devastating.

■ The final prong of our inquiry is the government interest at stake. Apparently departing from his earlier argument, the petitioner states in his brief that "the government interest in abuse and neglect cases is the protection of children and . . . is deserving of high regard." Nevertheless, he suggests that the government interest in keeping the family together is paramount. The State contends that although it recognizes the interest of the child and the parent in preserving the family unit, the State's *parens patriae* duty requires that it represent the safety interest of the child and assume that portion of the responsibility for parental duty that the parent has violated. "[P]arental rights are not absolute, but are subordinate to the State's *parens patriae* power, and must yield to the welfare of the child." *Preston v. Mercieri*, 133 N.H. 36, 40, 573 A.2d 128, 131 (1990).

■ When RSA 169-C:13 was enacted in 1979, the majority of the States that had adopted a standard in abuse and neglect cases used preponderance of the evidence. *See* S. Katz *et al., Child Neglect Laws in America*, 9 Fam. L. Q. 1, 32–33 (1975). When choosing the appropriate standard, "the drafters attempted to balance the rights of the parents and the rights of the child. Thus, it was decided that the preponderance standard should be adopted since it offered the best protection to the child." A. Harkaway *et al., New Hampshire Juvenile Justice Code of 1979: An Overview*, 21 N.H.B.J. 45, 70 n.67 (1980). Based on our analysis above, we find no constitutional error in the legislature's decision.

Assuming, as the petitioner does, that his liberty interest in his standing in the community is no greater than his interest in the parent-child relationship, we need not conduct a separate analysis on that issue.

■ The petitioner next argues that the evidence presented at trial did not support the court's finding that he had sexually abused Tracy. Our practice is to sustain the findings and rulings of the trial court unless they are unsupported by the evidence or tainted by error of law. *Averill v. Dreher-Holloway*, 134 N.H. 469, 472, 593 A.2d 1149, 1151 (1991). "The court, which is the trier of fact, is in the best position to assess and weigh the evidence before it because it has the benefit of observing the parties and their witnesses." *Abrams v. Abrams*, 131 N.H. 522, 525, 556 A.2d 1173, 1174 (1989). Consequently, our task is not to determine whether we would have found differently; rather, we determine whether a reasonable person could have found as the trial judge did. *Dreher-Holloway*, 134 N.H. at 472, 593 A.2d at 1151.

■ The petitioner hinges his argument on the facts that the examinations did not reveal any physical abuse, that Tracy recanted her story, and that the trial court made inconsistent findings of fact. We find none of these factors persuasive.

First, although Dr. McCanty's examination of Tracy revealed "no evidence of physical abuse," Wayment testified that most sexual abuse victims do not exhibit physical evidence of abuse. Second, Tracy admitted to recanting her allegations for the purpose of being reunited with her family. Finally, the fact that the trial court made inconsistent findings regarding whether the petitioner had visited Tracy on her eighth and ninth birthdays is harmless. The trial court found that the petitioner had sexually abused Tracy over an eight-year period that included those two birthdays, rather than specifically on those two dates.

The evidence presented included the testimony of the neighbor in whom Tracy had first confided about the abuse, several agency workers who interviewed and counseled Tracy, and the graphic, twenty-page letter in which Tracy described the abuse. We therefore conclude that the trial court had sufficient evidence before it to find that Tracy had been sexually abused by the petitioner.

■ Finally, the petitioner maintains that the trial court erred when it denied his request for a finding of fact that "the so-called 'behavioral indicators of abuse,' outlined on page 40 [and 41] of [S. SGROI, HANDBOOK OF CLINICAL INTERVENTION AND CHILD SEXUAL ABUSE (1985)], are rarely conclusive of sexual abuse, see Sgroi at p. 78." We need not determine whether the trial court erred in denying the petitioner's request, because any error that may have occurred was harmless. "Where it appears that an error did not af-

fect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment will not be disturbed." *Welch v. Gonic Realty Trust Co.*, 128 N.H. 532, 537–38, 517 A.2d 808, 811 (1986) (quotation omitted).

*Affirmed.*

All concurred.