NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2015-0062


OFFICER JOHN GANTERT

v.

CITY OF ROCHESTER & a.

Argued: October 8, 2015
Opinion Issued: March 18, 2016


Wilson, Bush, Durkin & Keefe, P.C., of Nashua (Charles J. Keefe on the brief and orally), for the plaintiff.


Terence M. O'Rourke, city attorney, by memorandum of law and orally, for the defendants.


Joseph A. Foster, attorney general (Patrick J. Queenan, assistant attorney general, on the brief and orally), for the State, as amicus curiae.


LYNN, J. The plaintiff, Officer John Gantert, appeals an order of the Superior Court (Wageling, J.) granting summary judgment to the defendants, the City of Rochester, the Rochester Police Department, and the Rochester Police Commission, on the plaintiff's claims of tortious interference with

prospective advantageous business relations, violations of his procedural due process rights, and damage to his reputation. All of his claims arise out of the defendants' alleged wrongful placement of the plaintiff on a so-called "Laurie List"[1] without affording him sufficient procedural due process. Because we find that the procedures afforded to the plaintiff in this case were adequate, we affirm the trial court's judgment.

I

The trial court found, or the parties agreed to, the following facts.[2] The plaintiff began working as a police officer in Rochester in March 2005. For six years he was viewed as a "good and productive officer" and had no disciplinary actions reflected in his personnel file. Upon beginning his shift on March 24, 2011, the plaintiff was instructed to assist another officer in booking an individual arrested for domestic violence. As part of the department's standard operating procedure in domestic violence cases, an officer interviews the victim and fills out a Lethality Assessment Protocol form (LAP), which assists in gauging the degree of violence and potential danger to the victim.

The LAP consists of a series of questions about past threats or violence committed by the accused, and the accused's access to weapons. The questions can be responded to with yes, no, or not answered. If a certain number of questions are answered "yes," the victim is considered to face a higher risk of lethal violence, and a protocol of assisting the victim is triggered. The LAP is also used to assist the court in determining the amount and conditions of bail.

Before ending his shift, the arresting officer had interviewed the victim, completed the LAP, and sent it to the county attorney. The plaintiff was not aware that the LAP had been completed and incorrectly believed that, pursuant to departmental policy, it was required to be sent to the county attorney with the rest of the arrest paperwork. After unsuccessfully attempting to contact the arresting officer or the victim, the plaintiff watched a videotaped interview of the victim by the arresting officer and completed a second LAP based upon information he learned from the interview. If a question on the LAP could be answered affirmatively based upon the video, he answered "yes"; if a question could not be so answered, he answered "no." The interview, which pertained only to the incident for which the accused had been arrested, did not cover many of the questions on the LAP, which mainly ask about past acts or behaviors.

---

[1] See State v. Laurie, 139 N.H. 325 (1995).
[2] The parties submitted an "Agreed Statement of Facts" and accompanying exhibits to the trial court. The court relied upon these facts in its order, and they are part of the record on appeal.

This resulted in the LAP completed by the plaintiff being materially different from the one completed by the arresting officer. The original LAP, completed with information from the victim, resulted in almost all of the questions being answered "yes," which triggered the protocol; the LAP completed by the plaintiff had almost all "no" answers, which would not trigger the protocol. The plaintiff signed the arresting officer's name and sent the second LAP to the county attorney. At no time did the plaintiff consult with a superior or another employee as to how to proceed in light of the fact that he had no knowledge of the answers to many of the LAP questions.

The county attorney discovered the conflicting LAPs and referred the matter to the Rochester Police Department. Lieutenant Toussaint investigated, conducting interviews with the plaintiff and other officers. According to Toussaint's report, the plaintiff "admitted that the LAP form questions were not answered in the interview" that he reviewed. The plaintiff "stated that he knew" that "none of the LAP questions had been covered" in the recorded interview and "that he made his best guess about the answers based upon the demeanor of the victim in the videotaped statement." When asked why he had put incorrect information on the LAP, the plaintiff stated that "he had no information to work with and that he knew that the LAP form was required to be sent to the County Attorney's Office."

Toussaint found that the plaintiff violated two departmental policies: Standard Operating Procedure 26.1.4, Subsection D.1.d, "Unsatisfactory Job Performance"; and Standard Operating Procedure 26.1.4, Subsection D.3.e, "Falsification of any reports, such as, but not limited to, vouchers, official reports, time records, leave records, or knowingly mak[ing] any false official statements." His report was forwarded to Deputy Police Chief Allen, who agreed with the findings and recommended that the plaintiff's employment be terminated.

This decision was forwarded to Chief Dubois, who concurred and wrote a letter to the plaintiff notifying him that he intended to recommend termination to the police commission. The plaintiff asked the chief if there was another possible resolution to the matter, to which he recalls the chief responding, "Nothing you can say or do will make me change my mind about this." The chief also notified the plaintiff that his actions could be "Laurie material" and that he intended to notify the county attorney. The chief scheduled a meeting with the plaintiff to provide him with an opportunity to discuss the chief's intent to notify the county attorney's office of the fact that the plaintiff's personnel file could contain Laurie material; citing advice from union counsel, the plaintiff declined to attend. The chief and the union agreed that the chief would not notify the county attorney of the Laurie issue until after the police commission made a final decision.

3

On June 16, 2011, the Rochester Police Commission voted to uphold the chief's decision to terminate the plaintiff's employment. After this decision, the chief sent a letter to the county attorney stating that "the Rochester Police Department has an internal affairs file which could possibly be construed to contain issues relevant to State v. Laurie. This file affects [the plaintiff]."

Pursuant to the collective bargaining agreement (CBA) between the city and the police union, the plaintiff challenged his discharge before the New Hampshire Public Employee Labor Relations Board (PELRB), which selected an arbitrator. Following a hearing, the arbitrator found that the Rochester Police Department "had just cause to discipline [the plaintiff] for entering false information [on] the LAP report and not following proper protocol," but that "discharge [was] too great a penalty in this case." The arbitrator found that the plaintiff's actions implicated his honesty and integrity, but he "did not intentionally falsify the LAP form." Given the plaintiff's statements during the investigation, we interpret this to mean that, although the plaintiff had no intent to deceive, he did know that he was providing information that could be incorrect. Although acknowledging that the chief stated that he would not hire an officer on the "Laurie List," the arbitrator stated that Laurie does not require the discharge of untruthful officers and noted that the conduct by the officer in Laurie was much more severe. These circumstances, coupled with the fact that the submission of the inaccurate LAP was an isolated incident and the plaintiff had no other disciplinary problems in the past, led the arbitrator to reduce the discipline to a suspension without pay from June 16 to November 7, 2011. The arbitrator did not rule on the "Laurie List" issue, stating that "[w]hether [the plaintiff] shall remain Laurie listed is beyond the Arbitrator's authority."

After the arbitrator's decision, the plaintiff requested that both the chief and the county attorney remove his name from the "Laurie List." Both declined.

The plaintiff then brought this suit against the defendants in superior court. He claimed that the defendants placed him on the "Laurie List" without proper procedural due process, and sought damages and injunctive relief to remove his name from the "Laurie List." The defendants objected. The trial court construed the parties' memoranda of law as cross-motions for summary judgment and ruled in favor of the defendants. The court found that the plaintiff had a constitutionally protected interest and was therefore entitled to due process. After balancing the competing interests at stake, however, it found that the plaintiff had received sufficient due process. This appeal followed.

We have recently explained the background and operation of "Laurie Lists." See Duchesne v. Hillsborough County Attorney, 167 N.H. 774, 777-82 (2015). As relevant here, prosecutors have a duty to disclose "both exculpatory information and information that may be used to impeach the State's witnesses." Id. at 777; see also Brady v. Maryland, 373 U.S. 83, 87 (1963). This duty extends to information known only to law enforcement agencies, such as information located in police officers' confidential personnel files. Duchesne, 167 N.H. at 777-78, 781-82. After we granted a criminal defendant a new trial due to the prosecution's failure to disclose information found in a police officer's employment files and records, see State v. Laurie, 139 N.H. 325, 327, 333 (1995), law enforcement authorities in this state began developing "Laurie Lists" to share information regarding officer conduct between police and prosecutors. Duchesne, 167 N.H. at 778-79.

In 2004, the Attorney General issued a memorandum (Memo) to all county attorneys and law enforcement agencies in the state, which aimed to "develop a standardized method for identifying and dealing with potential Laurie material," including "information contained in confidential police personnel files and internal investigations files." The Memo identified several categories of conduct that should generally be considered potential Laurie material:

- any sustained instance where an officer deliberately lied during a court case, administrative hearing, other official proceeding, in a police report, or in an internal investigation;
- any sustained instance when an officer falsified records or evidence;
- any sustained instance that an officer committed a theft or fraud;
- any sustained instance that an officer engaged in an egregious dereliction of duty . . . ;
- any sustained complaint of excessive use of force;
- any instance of mental instability that caused the police department to take some affirmative action to suspend the officer for evaluation or treatment.

Pursuant to the Memo, such material "must be retained in the officer's personnel file so that it is available for in camera review by a court and possible disclosure to a defendant in a criminal case."

Because police personnel files are generally confidential by statute, see RSA 105:13-b (2013), the Attorney General recognized in the Memo that prosecutors must rely upon police departments to identify Laurie issues. He

advised that law enforcement agencies should notify the county attorney, in writing, "whenever a determination is made that an officer has engaged in conduct that constitutes <u>Laurie</u> material." He placed responsibility on county attorneys to compile a confidential, comprehensive list of officers within each county who are subject to possible <u>Laurie</u> disclosure — the so-called "Laurie List." The county attorney is also informed if one of these officers leaves his or her law enforcement agency for another position.

The Memo included a sample policy and procedure for police departments to identify and retain <u>Laurie</u> material in their files. First, the deputy chief reviews all internal investigation files, including investigations conducted by other police personnel, and determines whether the incident involves any of the categories of conduct identified as potential <u>Laurie</u> material. If so, the deputy chief sends a memorandum to the chief, who reviews it and determines whether the incident constitutes a <u>Laurie</u> issue. If it does, the chief notifies the officer involved, who may request a meeting with the chief to present facts or evidence. After the chief makes a final decision, the chief notifies the county attorney if the incident is ultimately determined to constitute a <u>Laurie</u> issue.

The Rochester Police Department has adopted the procedure outlined in the Memo in its Standard Operating Procedures. The plaintiff acknowledges that the only difference between the procedure provided for in the Memo and the procedure utilized in this case is that he had an additional hearing before the Rochester Police Commission before the chief notified the county attorney that his file contained potential <u>Laurie</u> material.

III

On appeal, the plaintiff argues that the trial court erred in finding that: (1) the procedures established by the Attorney General's Memo provide sufficient due process, pursuant to Part I, Article 15 of the New Hampshire Constitution, before an officer is placed on the "Laurie List"; and (2) the plaintiff received sufficient procedural due process in this case. The defendants argue that the process afforded the plaintiff is constitutionally sufficient and that the trial court properly granted summary judgment to the defendants.

As noted above, the plaintiff received the procedures established by the Memo and an additional hearing before the police commission. For this reason, to the extent there is a meaningful difference between the procedure contemplated by the Memo and that which occurred here, the plaintiff received <u>more</u> process in this case. We thus need address only the plaintiff's second argument — whether the process he received in this case comports with the requirements of constitutional due process. Because this argument raises a

6

question of constitutional law, our review is de novo.  See State v. Veale, 158 N.H. 632, 636 (2009).

Part I, Article 15 of the New Hampshire Constitution provides that "[n]o subject shall be . . . deprived of his property, immunities, or privileges . . . or deprived of his life, liberty, or estate, but by . . . the law of the land."  N.H. CONST. pt. I, art. 15.  We have held that "law of the land" means due process of law.  Veale, 158 N.H. at 636.  "We engage in a two-part analysis in addressing procedural due process claims: first, we determine whether the individual has an interest that entitles him or her to due process protection; and second, if such an interest exists, we determine what process is due."  Doe v. State of N.H., 167 N.H. 382, 414 (2015).  "The ultimate standard for judging a due process claim is the notion of fundamental fairness."  Saviano v. Director, N.H. Div. of Motor Vehicles, 151 N.H. 315, 320 (2004).  "Fundamental fairness requires that government conduct conform to the community's sense of justice, decency and fair play."  Id.

Here, the defendants do not dispute that the plaintiff has an interest sufficient to entitle him to due process.  The question before us, therefore, is what process is due.  To determine what process is due, we balance three factors: (1) the private interest that is affected; (2) the risk of erroneous deprivation of that interest through the procedure used and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens resulting from additional procedural requirements.  Doe, 167 N.H. at 414.  "The requirements of due process are flexible and call for such procedural protections as the particular situation demands."  Id. (quotation omitted).

The private interest affected, as the trial court found, is the plaintiff's "reputation and ability to continue to work unimpeded as a police officer."  As we stated in Duchesne:

> Although the "Laurie List" is not available to members of the public generally, placement on the list all but guarantees that information about the officers will be disclosed to trial courts and/or defendants or their counsel any time the officers testify in a criminal case, thus potentially affecting their reputations and professional standing with those with whom they work and interact on a regular basis.

Duchesne, 167 N.H. at 783.  We have held that an interest in one's reputation, particularly in one's profession, is significant and that governmental actions affecting it require due process.  See Veale, 158 N.H. at 638-39; Petition of Bagley, 128 N.H. 275, 284 (1986) ("The general rule is that a person's liberty may be impaired when governmental action seriously damages his standing and associations in the community."); cf. Clark v. Manchester, 113 N.H. 270,

7

274 (1973) (holding that an employee was not entitled to due process, in part, because he failed to show "that the governmental conduct likely will . . . seriously damage his standing and associations in this community . . . [or] impose a stigma upon the employee that will foreclose future opportunities to practice his chosen profession" (quotation omitted)). Here, we agree that the private interest is significant.

The plaintiff argues that the procedure used "creates a great risk" of erroneous deprivation of his interest because he did not have "a full and fair opportunity to be heard." He contends that, although officers have an opportunity to meet with the chief prior to being placed on the "Laurie List," this occurs only after findings and determinations have been made at other levels of the department, leaving the officer with the task of trying to undo these conclusions. He further argues that officers are never given a hearing before an impartial tribunal. In his case, the plaintiff had a hearing before the Rochester Police Commission, but he argues that the police commission is not neutral given its ties to the police department. The plaintiff contends that a hearing that provides the ability to review evidence offered against him, present evidence of his own, cross-examine witnesses, and be represented by counsel, would be a proper procedure and would be the best method to "reach the truth of a matter" regarding a "Laurie List" issue.

The second factor tasks us to consider "the risk of erroneous deprivation of [the private] interest through the procedure used and the probable value of any additional or substitute procedural safeguards." Doe, 167 N.H. at 414. The plaintiff has not clearly articulated how or why the procedures followed by the Rochester police were unfair; nor has he shown that there was a true risk of erroneous deprivation of his interests.

The plaintiff spoke with the officer conducting the internal investigation and had the opportunity to explain his version of what had occurred. He also had the opportunity to meet with the chief before a final decision was made. Even accepting the plaintiff's assertion that the chief told him before their scheduled meeting that his mind was already made up — a circumstance that could raise concerns about the fairness of the proceeding — we note that the chief did not have the final word, as the ultimate decision was made by the police commission. Moreover, the chief did not conduct the investigation or make the initial findings, which the plaintiff does not claim were unfair or biased.

To the extent the plaintiff argues that this process is inherently biased against him, we do not find this argument persuasive. The plaintiff had multiple opportunities to be "heard" — by the investigating officer, the chief, and the police commission. His real complaint about the procedure appears to be that he does not agree with the decisions made by these various officials. The procedure he advocates might be more in-depth, but it is not clear that it

8

would add significantly to the accuracy of outcomes versus the procedure already in place.  See Appeal of Silverstein, 163 N.H. 192, 200 (2012) (holding that procedure whereby final decision on termination of public school teacher was made by the school board rather than a neutral third party, such as an arbitrator, did not offend due process).

Next we examine the government's interest.  Doe, 167 N.H. at 414.  We recognize that "the prosecutorial duty that spawned the creation and use of 'Laurie Lists' is of constitutional magnitude."  Duchesne, 167 N.H. at 780.  The government has a great interest in placing on the "Laurie List" officers whose confidential personnel files may contain exculpatory information.  See Laurie, 139 N.H. at 330 (holding that New Hampshire Constitution affords greater protection to criminal defendants and requires the State to prove beyond a reasonable doubt that the undisclosed exculpatory evidence would not have affected the verdict).

After balancing these interests, we conclude that the plaintiff was afforded sufficient process before he was placed on the "Laurie List."  Given the government's strong interest in meeting its constitutional Brady obligation, and its interest in not delaying placement of officers on the list, the procedures implemented in this case struck the proper balance.  Here, there was an internal investigation — which the plaintiff does not allege was unfairly or improperly conducted — two layers of review within the department, an opportunity to meet with the chief, and a hearing before the police commission.  There is no need for a more formalized hearing or additional process before an officer is placed on the "Laurie List."

However, as we explained in Duchesne, the interest of individual officers in their reputations and careers is such that there must be some post-placement mechanism available to an officer to seek removal from the "Laurie List" if the grounds for placement on the list are thereafter shown to be lacking in substance, as was the case in Duchesne.  In Duchesne, we recognized that after an officer is placed on the "Laurie List," he may have grounds for judicial relief if the circumstances that gave rise to the placement are clearly shown to be without basis.  Duchesne, 167 N.H. at 784-85.  In Duchesne, the findings by the arbitrator and the attorney general showed that the officers had not engaged in the conduct for which they were placed on the list.  Id. at 784.  Because the initial decision of the chief of police was reversed, there was no justification for keeping the officers on the "Laurie List."  Id. at 784-85.

Here, unlike in Duchesne, there is a basis for keeping the plaintiff on the list.  Although the arbitrator found that the plaintiff did not intentionally falsify the LAP, it is clear from his own admission that he supplied answers on the LAP that he knew he had no basis to believe were true.  This is certainly enough of a reflection on the plaintiff's general credibility to trigger at least a prosecutor's obligation to disclose such information to a court for in camera

9

review in a case in which the plaintiff will appear as a state witness.[3]  See id. at 783-84.

The plaintiff suggests that the employment disciplinary process culminating in the arbitration is distinct from the "Laurie List" designation process and, as such, officers should be provided a separate hearing dealing solely with the Laurie issue.  We find this argument unpersuasive because both the discipline and the "Laurie List" designation were predicated on the same underlying conduct of the plaintiff.

In Duchesne, we held that the trial court erred in not ordering the removal of officers from the "Laurie List" because the original allegation of misconduct "ha[d] been determined to be unfounded," so there was "no sustained basis for the petitioners' placement on the 'Laurie List.'"  Id. at 784-85.  Crucial to our holding was that "the chief's decision was overturned by an arbitrator, a neutral factfinder, following a full hearing conducted pursuant to procedures agreed to in the CBA," and "[a]s a result of these determinations, references to the incident [had] been removed from the petitioners' personnel files."  Id. at 784.  The arbitration in Duchesne did not examine the officers' placement on the "Laurie List," but rather whether the city had just cause to take disciplinary action against the officers.  Id. at 775-76.  The arbitration dealt with the facts of the incident underlying their placement on the list, and we therefore held that the decision affected the Laurie issue.  Id. at 784-85.

The same is true here.  Although the arbitrator in this case noted that he had no authority over the plaintiff's placement on the "Laurie List," and his decision did not focus specifically on the Laurie issue, his decision was based upon the same information that led to the plaintiff's placement on the list.  Had his findings been different, they could have had the same ramifications as in Duchesne, i.e., providing a basis for removing the plaintiff from the "Laurie List."  However, in contrast to Duchesne, the arbitrator's decision in this case did not establish that there was no basis for the plaintiff's placement on the "Laurie List."  Having an additional hearing to examine the same facts would serve little purpose.

Our decision in Duchesne did not prescribe any specific procedures that law enforcement or prosecutorial authorities must follow in connection with the use of "Laurie Lists."  Instead, we merely recognized that basic notions of fairness require that an officer must be removed from the list when it is clear that there are no valid grounds for his being on the list, and that, absent other available procedures, the courts can provide a remedy to an aggrieved officer.

---

[3] The record shows that three judges, after reviewing the plaintiff's personnel records in camera, determined that portions of the record contained potentially relevant and/or potentially exculpatory information, and ordered that parts of the file be disclosed to the prosecutor and defense attorney.

Id. at 784-85.  We are cognizant of the fact that the legislature is currently examining "Laurie List" issues.  See Laws 2015, ch. 150 ("establishing a commission to study the use of police personnel files as they relate to the Laurie List").  Subject to the constitutional obligations imposed on the State under Brady and its progeny, we think that the legislature, rather than this court, is the proper body to regulate the use of "Laurie Lists," including the development of procedures for the placement of police officers on, and their removal from, such lists.  In the case before us, it is sufficient to hold that the plaintiff was afforded all the process he was due.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.